Thank you. You may be seated. Our next case is case number 415-0843. Colin Krim versus Gina Dietrich. For the appellant, we have Jonathan Nessler. And for the appellee, good afternoon, Craig Unrath. Are you ready to proceed, Mr. Nessler? Yes, ma'am. Thank you. You may be seated. Thank you, Your Honors. Counsel, and may it please the Court. The trial court erred when it granted the defendant's motion for a directed verdict for the cause of action of informed consent. A directed verdict is only appropriate when a plaintiff has not presented a prima facie case or established a prima facie case. In the Krim trial, the plaintiff has established a prima facie case for informed consent and the trial court's order granting the motion for a directed verdict should be reversed. Informed consent imposes upon a medical professional a pre-treatment duty to disclose material medical information about a treatment. Specifically, if that material medical information would alter or might alter a patient's decision of whether to undergo the treatment. In order to establish a prima facie case, a plaintiff has to prove four elements or support four elements at trial. The first is that there was a duty to disclose the information. The second is that the defendant failed to inform or to adequately inform the patient of some material medical information with regard to the procedure which a reasonably careful physician would have disclosed under the same or similar circumstances. The third element is that had the defendant disclosed that information, a reasonable person in the same position as the patient plaintiff would have changed their course with regard to the procedure. And fourth, that the plaintiffs were injured as a result of undergoing the proposed procedure. The plaintiffs introduced evidence to support each one of these elements. At the time of trial, when the motion for a directed verdict was filed, the defendants admitted that the plaintiff had supported the first two elements. Now in the course of appeal, they've changed that decision, but for the purposes of this oral argument, if it pleases the court, I'd like to begin by discussing the third element, if that's all right with everybody, because that's where the trial court focused their decision. In order to support the third element, a plaintiff must be able to point to significant undisclosed information which would alter a reasonable patient's decision to undergo the procedure. So the issue in this case to begin with is what is significant undisclosed information? What is meant by significant undisclosed information? Depending on the case, significant undisclosed information might include information, pros and cons, risks of the procedure itself. It might include alternatives to the procedure, and it might include information about pros and cons about the alternative. So that's the information, but what makes that information significant? Significant undisclosed information. Well, if a jury, I think it's better answered by saying that a prima facie showing of the third element is established if the plaintiff introduces sufficient evidence together with the reasonable inferences drawn therefrom to allow a jury to determine that if the information was disclosed, a reasonable person in the same or similar situation as the plaintiff patient would have changed the course. So if it would have changed the course of a reasonable person, it is significant undisclosed information. It does not require, nor does any case stand for the proposition that element three requires, the precise and formulated testimony of an expert that to a reasonable degree of medical certainty, a reasonable person in the same position of the plaintiff would have changed their position. Not required. And how do you reconcile that position, Mr. Nestle, with the position of opposing counsel that St. Jim, if that's the correct pronunciation, says that you do have to have that? Sure. Thank you, Your Honor. I think that when I began my evaluation of this issue, I asked myself a very simple question. Why do we require medical testimony to certain aspects of a medical malpractice case? Why do we require a physician's testimony to those aspects? A physician has education, training, and experience that's beyond that of the average person, the average ordinary person, the average juror. So what does that knowledge and training allow him to do? It allows him to discuss what another physician would do, what is reasonable for another physician. But the element three does not ask what a reasonable physician does. Element three asks what a reasonable person does. So the very basis or the very foundation of why we have expert testimony in medical malpractice cases doesn't apply. And when we look at St. Jim, I think that we can see that that's really what they're talking about, that there is no requirement in St. Jim that there is a formulaic, specific requirement of a testimony that to a reasonable degree of medical certainty an ordinary person would do X, Y, or Z. When we look at St. Jim, I think the first thing we need to do is look at the procedural posture of that case. That case went to the jury on informed consent. The jury rendered a verdict in favor of the defendant. And that is very, very significant, because on review, the review was to a manifest weight of the evidence. Was the jury's decision against the manifest weight of the evidence? So when we look at Jim A, we see a dental malpractice case. We see a case where the plaintiff patient underwent a tooth extraction and as a result suffered from paresthesia. And he said, if I would have known paresthesia was an option, I wouldn't have undergone that procedure. The plaintiff testified to that. But the only evidence on the record from any of the experts, and the only evidence that that case discusses when it talks about expert testimony, is the lack of alternative. So what the court really decides in St. Jim A, is that it is not against the manifest weight of the evidence for a jury to find that a reasonable person would... Let me restart that. If you don't mind, there's a lot of double negatives. I apologize. What the court really found was that it is not against the manifest evidence for a jury to find that it is unreasonable for a person to say, I won't have this tooth extracted because of this disclosure of information that might cause paresthesia, when the alternative is death. In other words, no reasonable person would say, yeah, I choose death over the possibility of paresthesia. And so what they're really saying is that a jury finding that, not against the manifest weight of the evidence. They are not saying, nor is it anywhere in that case, that an expert must testify to a reasonable degree of medical certainty that a reasonable person in the position of the plaintiff would have made this decision. It focuses its analysis on the lack of alternatives. And the lack of alternatives is one of those bits of information that we talked about at the beginning. The plaintiff, to support element three, must be able to point to significant, undisclosed information. One of those might be alternatives. So, when we look at it that way, we see that we can reconcile St. Jemmings with the Schiff case, with the Coriell case, with the Davis case, with the Smith case. They all talk about it. Davis calls it the grave man of an informed consent case. To be able to point to significant, undisclosed information, which might change a reasonable person who is in the position of the plaintiff. So, I think that looking at St. Jemmings from a procedural posture, we can see that it is completely reconcilable with Schiff, Coriell, and Davis. And I think that when we look at the evidence that came in in the Crim trial, we can see that the plaintiff did provide significant, undisclosed information, which might have changed Ms. Crim's decision of whether to undergo an attempt at a vaginal birth of a macrosomic fetus or have a C-section. Dr. Dietrich admits that there is a risk associated with vaginal delivery of a macrosomic child. She admits that a major concern is shoulder dystocia and an intended risk of brachial plexus palsy. She admits that a C-section is an alternative. So, we already have the risks associated with the procedure, the vaginal birth of a macrosomic child. We have an alternative possibility. And Dr. Benson not only supports her testimony in the first two by discussing the risks associated with the vaginal birth of a macrosomic infant and the alternative of a C-section. He also goes on to discuss the risks, pros, and cons of that alternative, the three types of information that are necessary to show a jury. So, once the jury has this information, it has been informed about all of these different types of things, all of this information, then it's for them to determine whether a reasonable person in the juror's position would have considered this information significant. Would they have changed their mind about undergoing the procedure, choosing an alternative procedure? So, what the plaintiff has done in this case is present ample evidence that he can point to, or that we can point to, as significant undisclosed information which the jury could look at and say, would that change what a reasonable person would do? Not what a reasonable physician would do, but what a reasonable person would do. And the jury is in the best place to make that decision. The second issue before the Court today comes up on appeal, and that is whether the plaintiff established duty. The record is replete with information about duty. The plaintiff introduced evidence of, first, the three bits of information. The plaintiff's expert testified that a reasonably careful physician would talk about this information with the patient at 4,500 grams to 5,000 grams. Even the defendant herself admitted that a reasonably careful physician talks about it at 5,000 grams. An 11.2 pound infant is above 5,000 grams. The jury had all of the evidence necessary to understand what the duty to disclose was. The plaintiff's case is nothing like the Welton case. In the Welton case, they say that, well, you don't have to disclose every risk associated with it. We're not talking about the risk of vaginal birth. We're talking about the risk of vaginal birth of a macrosomic fetus, a macrosomic infant. And I think that that's just so important, because all of the evidence leads up to, first, should she have made the determination that this was a big baby? And, second, what are the risks associated with the vaginal birth of a big baby, what alternatives are available, and what are the pros and cons of those alternatives? All of the evidence on the record at trial supports all four elements. One, that there was a duty to disclose, that the doctor did not disclose significant information that a reasonably careful physician would have disclosed under the same or similar circumstances, that the plaintiff was then able to point to this significant information as information which might change a reasonable person's mind. And then, lastly, there was expert testimony that the procedure caused the brake-reflexes policy. Counsel, the defendants cite Marshall versus University of Chicago Hospitals in their brief for the holding that it was incumbent upon plaintiff to prove by objective evidence that a reasonable person in possession of the allegedly omitted information would have rejected the treatment in question. Yes, sir. Do you respond to that or provide in your reply brief some discussion about the Marshall case? I did not address it specifically, but I am able to, Your Honor. Well, the first observation is it's troubling you did not. Why would you not have done so? This seems to be a fairly recent decision of the First District, directly in support of their position, doesn't it? I don't believe it's directly in support of their position, and I do believe that the argument that we've proffered as part of our brief and our reply brief directly applies to that case also. That case had a 99% chance of success with the tubal ligation, 99% chance of success. The only alternative that they talked about was a 90% chance on pills that also made her sick. So, again, we run into the same situation of this is not a viable alternative. It's a worse alternative. It's not an alternative that has a lesser risk or a better situation or a better outcome for the patient. It's a worse alternative. No reasonable person, despite what they say, would say, yeah, I'll take the less effective method of birth control that also makes me sick when they're complaining about the fact that they had a child. And so, again, what we're faced with is a no alternative at all. And so, exactly. If there's a good response, counsel, it would have been even better had it been in your reply brief. I apologize, Your Honor. Go ahead. I believe that the plaintiff did support a prima facie case at the trial for an informed consent cause of action. The trial court erred when they granted the directed verdict. It should be reversed, and I would ask Your Honors to please, if you have any questions. I don't see any at this time. Thank you, Mr. Nessel. We have time on rebuttal. Mr. Unrath, are you ready to proceed? Thank you, Your Honor, counsel. My name is Craig Unrath. I represent the defendant, Dr. Dietrich. The first issue that we have to discuss is the proper pronunciation of the St. Germain case. I prefer to call it St. Jim. I said Jim, too, but I don't know. We know what we're talking about. Moving on to the second point of contention, the trial court's ruling is based on Fourth District law, that in all failure to warrant cases, there must be expert evidence not only as to negligence but also proximate cause. Well, assuming for the moment you're right that that's what the St. Jim case stands for, if that is correct, then the trial court is bound by it. We are not. Why does that make sense, counsel? It makes sense because counsel earlier spoke about the fact that in St. Jim there was no alternative. She had a choice between having a tooth extracted or death. Ask yourself, how was that fact established? Well, I don't want to talk about the St. Jim case. I want to talk about this case. I want to talk about the ruling in St. Jim, your arguing applies here in the trial court, is it's not enough in a consent case for the patient to say, one, I wasn't told this, and, two, had I been told this, I wouldn't have opted for this procedure or would have opted for the alternative, such as I would have opted for a C-section. Your argument is, oh, no, that's not good enough, and the plaintiff had to present expert testimony, what a reasonably prudent person in the same circumstances of the plaintiff would have done. Isn't that correct? It's correct. So how does that make any sense is what I want to know. It makes sense because that expert testimony will define the alternatives just as it was in St. Jim. Had they presented this to the jury and said, well, she could have had this tooth pulled or not. Now, stay in the facts of this case. I want to know the facts of this case. Why, indeed, you know, I want to be clear about this. Not only why was it required, why was it even admissible for experts to say, you know, let me tell you about what a reasonably prudent person would have done when presented with this, as opposed to the testimony of the actual plaintiff who said, I would have opted for a C-section. What we had in the present case is an expert witness who gave a laundry list, grocery list of generic complications to vaginal birth and a C-section. At no point did the experts say, Dr. Dietrich should have said this, should have warned the patient of this precisely. All he said was there are complications with both. And he gave a list. Wasn't there testimony in this record, expert witness testimony, presented by the plaintiff about how Dr. Dietrich should have told the plaintiff about these various problems and given about how a C-section was an option? All that was provided was a generic list of complications. So your answer is nothing was presented in support of that fundamental claim? Because if that's true, then we wouldn't have to even reach the other issue, would we? I mean, then plaintiff would have failed to present expert witness testimony that Dr. Dietrich was under an obligation or ever explained this because there was no testimony. I agree with that. Did you make that argument to the trial court and direct the verdict, or was it on the basis of instead where's the reasonably prudent patient testimony? The argument made at the trial court was limited to the reasonably prudent patient, but there was no expert testimony as to that effect. Well, see, that's a bit troubling because I would expect that if, in fact, the defendant had failed to present any evidence that Dr. Dietrich should have told the plaintiff about these complications and should have expressed how a C-section might have been better, that would have been a basis for a motion for a directed verdict for that failure, right? I agree. And yet it wasn't done? However, however, Your Honor, I would point out that Judge Drummond did not mechanically apply the St. Jem case to its ruling. There is an alternative ruling here, and he pointed this out. He said that first he acknowledged that there was no expert testimony as to what a reasonable person would do. He then said, and this is a quote, that this is particularly important in this case where the experts seem to pull back on the reliability of estimating the final weight, that until the child is born, that's hard to do, unquote. That is hard to do. He pointed out that none of the methods for estimating fetal weight are reliable, and he specifically noted that this was an additional basis for the partial directed verdict. So this was not just a mechanical application of the no expert testimony rule. He is applying this to the specific facts in this case. So you ask, how does this play into this? How is the fact that this unreliability played into it? When Dr. Benson gave his testimony as to what should have been, what Dr. Dietrich should have said, it would have gone, had he been asked this question, which he was not, what should Dr. Dietrich have done? The answer would have come out something like this. We have a number of unreliable tests for showing fetal weight. Right now, all those tests are in the normal range. It's possible that we could do another test, and it would show that your child is in excess of 5,000 grams, but that test would not be reliable. Now, based on this unreliable testing, do you believe that you would like to relinquish your stated desire for a natural childbirth and choose instead a C-section which has a number of complications of its own? Now, had Dr. Benson been asked that question, had he answered truthfully, because the unreliability of those tests is a significant portion of his expert testimony, the case would have collapsed. There's no case at all. It's based entirely on speculation. Also, he avoided the question. Instead of saying, we have a number of unreliable tests that you might need to consider, and you may want to take this into account in deciding whether you want to continue with a natural childbirth, he avoided that question. Actually, he didn't avoid it. It was never asked. Instead, he merely gave a generic list of possible complications that could arise in a macrosomic child, and yet he admitted that there's no reliable way of actually confirming that. Now, as I see it, there is no objective evidence whatsoever in this case establishing what should have been told to Dr. Dietrich. Dr. Dietrich should have told to the patient, nor is there any reliable evidence that the failure to give this testimony, that those warnings, would have changed the outcome of the case. Now, did Dr. Dietrich make some admissions related to those issues in testifying? She testified that she, on a number of occasions, told the patient that she expected a fetus of about 8 to 9 pounds. She told the patient that she had been monitoring the weight of the fetus, that all tests appeared, there were some discrepancies, but all tests appeared to show a fetus in the normal range. There was no test that showed that this child was in excess of 5,000 grams, and she was taken completely by surprise when the child was turned out to be, I believe, 11 pounds. So she at no time conceded that she should have talked to the patient about a possible C-section as an alternative? I don't recall any concessions on that point. I do know that the patient had repeatedly stated that she had a strong desire for a natural childbirth. I know that Dr. Dietrich had offered to move along the pregnancy, to induce a childbirth, and she turned that down. She wanted to do this entirely naturally. Did she testify that a reasonably careful obstetrician would have discussed with an expectant mother the option of delivering a fetus with an estimated weight of 5,000 grams or more by C-section? She may have made that statement. However, there was no evidence, no tests that had shown that would even indicate a child of that size, a fetus of that size. We see this as a complete failure proof. If plaintiffs had chosen to ask their expert, what is it that Dr. Dietrich should have told the patient, Judge Drummond realized that that would be incorporating the evidence that all of the tests that would establish an overweight fetus were unreliable. And on that basis, we are put in a position to... Well, I'm not sure I understand the point you're making here. It seems to me that, and I'll be interested in hearing Mr. Nestler's point on this, it's an overstatement to say that there's no requirement on doctors to discuss with their patients the results of tests unless they're 100% determinative of what those tests suggest. In other words, if you're doing tests and there is uncertainty that a child might be 5,000 grams or more, it seems to me that the appropriate thing to do for a physician in this situation is say, we can't say for sure, but you might be having a big baby here and this could create problems. And I would respond... You seem to be disregarding, oh, we just got a bunch of tests that we don't know for sure what can happen, so therefore there's no obligation to discuss it. And this would have to be discussed with every patient. Well, I'm not talking about every patient. I'm talking about this patient here and now and the tests that were performed. And why would the tests be performed, and is it your position that the tests are of no value, which seems to be what you're suggesting, to either the physician who ordered the tests or to a patient who's been tested unless the doctors can say definitively this is what they mean? If there is an indication, when it becomes more likely true than not that they were facing a macrosomic fetus, yes, of course, it would be a duty to inform. In this case, they had no such evidence, none at all. And I go back to the St. Jem case where the choice was between death or having the tooth extracted and risking paresthesia. How was that established? That was established through expert testimony. The choice that was given to the jury was established by expert testimony. And that's what Dr. Benson's role was here, was to show that there was a distinct choice here and that it was more likely true than not that the tests revealed a macrosomic baby and that she should consider a C-section. And the problem here, there's no evidence of that. All of the tests... No evidence of what? No evidence of an overweight fetus. There is every test... Is there evidence that there might be an overweight fetus? There would be unreliable evidence in every case. What does that mean, unreliable evidence? We think the test... Well, it wouldn't be in every case. I would assume that the test would... You'd be able to rule out a 5,000-gram baby when the baby isn't that big. But if it's uncertain, you'd have to... Why wouldn't that be an important thing to say to an expectant mother? Dr. Benson admitted himself. He says it's very difficult. He says... Very difficult to what? To determine the weight of the child prior to birth. He said it's speculation. It's not a choice between death and paresthesia. It's a choice between, well, we have some tests that we really can't rely on one way or the other, but when you accumulate all of them, perhaps... And then he would stumble off and say, it's really hard to say. If we disagree with the analysis of St. Jim for holding that there's got to be evidence of what the reasonable, prudent person would do, aside from the evidence of the very plaintiff here, do you lose? Or is it... And I frankly didn't even understand this before as being an alternative argument, that even if that rule is not something we accept or should accept, the plaintiff still loses for the alternative ground, and you could always argue an alternative ground of affirming the trial court's judgment because they didn't present evidence, direct evidence, about how the expert evidence as to what Dr. Dietrich should have said that she failed to do. That would be part of the plaintiff's burden. But maybe I missed that. Was that argued as an alternative in your brief to this court? Yes, it was. What portion of that? That would be, my recollection is, Section 1B. And the argument was that even leaving aside the business about the reasonably prudent person or the reasonably prudent patient, there was a failure to present evidence to support this claim from Dr. Benson or anyone else that Dr. Dietrich should have communicated this information to the plaintiff. Absolutely, Your Honor. Okay. In other words, even under Corriell, this case fails. Okay. I believe that the opposing counsel had mentioned the role of an expert in these cases, and the role is to define the risks, to give the choices. What are the odds of this happening over the alternative path? At that point, you can send this to the jury. Well, no, I want to be real clear.  from the plaintiff's point of view is, Dr. Benson, in your expert opinion, what should Dr. Dietrich have told the plaintiff about the risks in this case? Yes. And he was never asked that question and he never answered it. Okay. Well, I want to make sure that I understood that. Go ahead. Your Honor, that's all I have at this point. If there are no further questions, we ask the Court to affirm Trackworth's ruling. Thank you. Thank you. Any rebuttal? So, Mr. Nessler, you know where I'm going. Yes, Your Honor. What part of the case shows that question was asked and that answer given to address your burden to present expert testimony that what Dr. Dietrich failed to say in this case was a medical negligence. She failed to live up to the standard. Yes, Your Honor. Where is that? In three different places, Your Honor. Okay. First, the admission of the defendant herself that if a fetus is identified as greater than 5,000 grams, they should have the conversation about the pros and cons of the risk associated with vaginal birth of a macrosomic fetus, the alternative to the pros and cons, the discussion about the option of a C-section. Second, my expert, Benson, mentions that he thinks it's 4,500 grams, but it could be 5,000. And then third, in the opinion section, I ask specifically, do you have an opinion based upon a reasonable degree of medical certainty whether a failure of that discussion to take place violates the standard of care? He goes on to answer, and I think the part that the Court was talking about, to just absolutely directly confront one of your questions or answer one of your questions, at the end of that line of questioning, he states, the chance is more likely than not that a macrosomic baby would have been identified and then the standard of care would require that she discuss the risk and benefits of vaginal birth versus a C-section. Where is that? That is, I can give you the appendix or the R. The appendix is 294, lines 7 through 10. The entire line of questioning where it starts with the question that I asked is A-293, line 2, through that page and then through the last slide that I gave you, Your Honor. So he does say that these tests have some problems with reliability, but in this case, the facts of this case were all of the tests were coming back that this could be a microsomic fetus. The fundal heights were off. That's a sign that it could be a big baby. Well, it could also be amniotic fluid. So the doctor had a sonogram performed, an ultrasound performed, and was asked did that rule out the possibility of amniotic fluid being the issue? Yeah, that ruled out that possibility. Well, you still didn't think it might be a big baby? No, I still didn't think it might be a big baby. That's two tests that show that it might be a big baby. And then there's physical palpitation, I'm blanking on the maneuver's name,  and the doctor says on the site that I just provided, the chance is more likely than not that a macrosomic baby would have been identified and then the standard of care would require this discussion of the benefits of vaginal birth versus cesarean section. It is, in my opinion, without question, at trial, I think defense counsel might have said it best, he merely laid out that there was a duty and then he testified that it was a deviation from the standard of care. Who said that? Mr. Harless at the trial, the defense. He was defense counsel? Yes, and that is on page 7, lines 2 through 4. Page 7, lines 2 through 4 of what? Of the appendix, Your Honor. Okay, go ahead. There's no question in my mind that the first two elements were addressed. There was no question in anybody's mind at the trial that the first two elements were addressed. The issue in this case, I think, is the third element. On the motion for directed verdict, did the defendant argue that there was no evidence, as you just heard, the argument made by Mr. Unrath to support what Dr. Dietrich should have said to Ms. Crimm or was it based upon the St. Jem case about the reasonably prudent patient? And if it goes over, may I finish my answer, Your Honor? It's not over yet. No, is the answer to your question. He did not address that. He never claimed that the information was not given. The entire argument was based on St. Jemmé and that St. Jemmé somehow requires the very specific and formulaic testimony of a physician that to a reasonable degree of medical certainty, an ordinary person in the same position as this patient would have chosen a different option. That was the entirety of the directed verdict argument and that was the entirety of the judge's decision, the way I read it. There was no argument made by the defendant in the motion for directed verdict that you failed to meet your burden of presenting expert testimony, that Dr. Dietrich was required to communicate this information to the plaintiff? No, Your Honor. He stipulates at the very beginning of the argument that the plaintiff laid out duty and that the expert testified that there was a deviation from the standard of care. That's Dr. Benson. The expert that he's talking about there, yes, that's Adrian Harless' words, but that's Dr. Benson. Your time is up, counsel. Thank you very much. Thank you, Your Honor. We'll take this matter under advisement.